Filed 10/15/25  In re A.D. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. H.D., Defendant and Appellant. | G065521 (Super. Ct. No. 23DP0322) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

H.D. (the father) appeals from a custody order issued at the close of dependency proceedings pursuant to Welfare and Institutions Code section 362.4.[1] The juvenile court granted A.Q. (the mother) sole custody over A.D., who was two years old at the time. The father claims this was error. We find no abuse of the court's discretion and affirm the order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

*A. Detention, Jurisdiction and Disposition*

We focus on the facts relevant to the limited issue on appeal. A.D., a baby girl, was born in March 2023. The mother was 21 years old at the time and the father was 23. After A.D.'s birth, the Orange County Social Services Agency (SSA) received a referral alleging general neglect after A.D. tested positive for marijuana and "the mother tested positive for fentanyl, cocaine, marijuana, and amphetamines . . . ."

SSA filed a section 300 petition alleging failure to protect. The child was detained from the mother and left in the care of the father on March 29. Protective orders were issued under which the father was required to undergo drug testing.

In mid-May, A.D. was removed from the father's care. He had not abided by the protective orders, failing to appear for numerous drug tests. He tested positive in another instance. He was also arrested for assault and battery and failed to inform SSA of the incident until May 16. The child was initially placed with L.D., the paternal grandmother, but soon after, she was moved to the home of E.P., the paternal great-grandmother.

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

2

SSA filed an amended petition alleging that the father had a history of issues related to anger management, domestic violence, and violence against others, including a prior conviction and the current arrest. The petition further alleged the father "may have unresolved substance abuse issues, which includes, but may not be limited to alcohol and marijuana." He had an open criminal case for driving under the influence of alcohol and drugs based on a 2021 arrest. He had also sent aggressively worded text messages to the mother.

On July 19, the court sustained the amended petition, which included the mother's substance abuse and mental health issues and the father's anger issues and substance abuse history. A.D. was removed from her parents' custody, and the parents were granted reunification services.

*B. Reunification*

The father was ordered to participate in general counseling, a parent education program, substance abuse testing, and a 12-step program. During the initial review period, he met with SSA and reported that he had not completed general counseling due to an issue with the service provider. He did complete a parenting education course. His compliance with drug testing was inconsistent and he did not provide adequate proof of participation in a 12-step program. The mother had participated in her ordered services, but tested positive for fentanyl on November 20. On February 28, 2024, the juvenile court maintained A.D.'s placement and extended services for the parents.

By the second scheduled review in the summer of 2024, SSA was recommending A.D. be returned to the mother. She had made considerable progress in various areas, and she was scheduled to complete therapy by July 29. She had completed a parenting program and was compliant with her

3

substance abuse treatment, participating in a 12-step program and a substance abuse program. All of her tests had been negative, and she had not missed any tests.

The father had completed some of his counseling sessions by this time. He had started a substance abuse program but had voluntarily stopped. He did not participate in drug testing or provide proof of participation in a 12-step program. He had not met monthly with SSA.

SSA had placed A.D. with the mother in a 60-day trial release in mid-May. SSA reported that the mother and E.P. had ensured the child's needs were met while in their respective care.

At the end of July, the mother contacted SSA. Based on a social media photograph, she was concerned the father owned a firearm. She also reported a voicemail message the father had sent her, although the mother did not recall the date. The transcript of the alleged message was included in SSA's report: "'I took your pregnancy away from you?! No bitch, you took your own pregnancy away from yourself doing drugs, you f[–]en crackhead. I hope yo' stupid ass die; I hope you step off the curb and get hit by a car. I f[–]en hate you bitch. I've always hated you but we have a daughter together, so I try to be nice to yo' stupid white ass, but when I catch you, I'm going to beat the f[–] out you; I swear to God!'"

When contacted by SSA, the father admitted he did not get along with the mother. He said he did get upset with her often but denied making any threats.

Meanwhile, the trial visit between the mother and A.D. went well. SSA conducted unannounced visits and repeatedly found the home "tidy, clean, and organized; there were no visible safety hazards or concerns noted during the in-person visits. The child was not observed to have any

marks and/or bruises on the exposed parts of her body that were suspicious in nature. . . ."

In August, SSA found that the father had failed to appear for any of his eight drug tests in July or August. He was no longer attending his outpatient substance abuse program or a 12-step program. He also failed to attend meetings with SSA. Later that month, the mother advised SSA that the father was incarcerated and provided booking information.

In September, the court ordered A.D. returned to the mother under ongoing family maintenance supervision.

*C. Family Maintenance*

Prior to the next hearing, SSA recommended terminating dependency with exit orders. SSA reported the father's visits continued to be supervised by L.D. and E.P. They reported that the father failed to show up or arrived very late to some visits. They were communicating well with the mother regarding visits and expected to have the same level of communication once the case was closed. The mother had suspicions that the father had little contact with the child.

The father's contact with SSA was poor. SSA's report includes a dense paragraph of no-show appointments and attempted calls. In April 2025, the father responded sarcastically to the social worker's attempt to schedule a meeting. On another occasion, the father said he knew he was noncompliant with his case plan, which he blamed on his work schedule. He claimed he would do anything the court asked of him.

At the final hearing in the case on May 6, 2025, the father was the only witness. The father objected to SSA's proposed exit orders, particularly sole legal custody being granted to the mother. Under the

proposed orders, the father would have 18 hours of supervised visitation per week.

The father testified that his relationship with the mother was "[s]ometimes . . . really good, and sometimes it can be really bad. It depends on how both parties feel that day, I guess, right?" He said they were trying to have a better relationship for their daughter and described it as "decent." He believed he could coparent with her.

With regard to his involvement in medical and dental care, he said he went "to a couple of them" when the child was placed with E.P. He said the social worker did not tell him about A.D.'s appointments, and that "[t]he mom doesn't hit me up and let me know those things often, but I do want to know. I would like to know." He said it was hard for the mother "to be in the same room with me sometimes without getting really frustrated. So I think that's kind of why she doesn't have me go all the time."

When asked why he wanted joint legal custody, the father said: "I think it's important because it's a step in the right direction for me. You know, if we do close with these exit orders today, I can go to—I can go to the next courtroom and deal with it that way, once my circumstances get a little bit better."

After the father testified, the court heard argument. The mother's counsel argued that she should have sole legal custody as the sole caregiver. Minor's counsel agreed the exit orders were appropriate and agreed the case should be closed, conditioned on the mother receiving sole physical and legal custody. The father's counsel contended that awarding sole legal custody to the mother would "close out the paternal family" and was not in the child's best interests. After the close of argument, the court ruled that it was awarding the mother legal and physical custody. The father now appeals.

## DISCUSSION

## I.

### THE FATHER HAS NOT ESTABLISHED AN ABUSE OF DISCRETION

*A. Statutory Framework*

"If the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court . . . the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4, subd. (a).) "'[I]n making exit orders, the juvenile court must look at the best interests of the child.'" (*In re J.M.* (2023) 89 Cal.App.5th 95, 112.) "The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests." (*Ibid.*) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.'" (*Ibid.*)

*B. Standard of Review*

"'[T]he juvenile court has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a dependency case (§ 362.4).' [Citation.] We review the juvenile court's exit orders for an abuse of that discretion. [Citations.] We will not disturb the juvenile court's decision "'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"'" (*In re J.M., supra,* 89 Cal.App.5th at pp. 112–113.)

*C. No Abuse of Discretion*

The father pays lip service to the standard of review while ignoring it in practice. His opening brief spends pages and pages setting forth evidence he deems to be in his favor. He is essentially asking this court not to review for abuse of discretion, but to reweigh the evidence. That, of course, we cannot do. The court did not, as the father claims, "ignore[]" his testimony. Indeed, the court discussed the father's testimony and relied on it when ruling, just not in the manner the father would have preferred.

In its ruling, the court stated: "I did want to explain to you my reasoning. So I know you're asking for joint legal. I know that's kind of, like, the hang-up here. The standard in California is best interest of [A.D.], and in no way am I saying that you don't love your daughter, that you don't care for her at all, but a lot of what I heard in your testimony was that getting joint legal is the right direction for you, sir, like it's in your best interest, it will help you in the future if you want to seek greater custody of [A.D.], when your situation improves and you're more stable, you would have sort of a better footing. So that's not necessarily the standard that I'm looking for. [¶] . . . Your mom, your grandmother are the best in terms of helping you, right, as they are now, but I can't give joint legal based on how present your extended family is. It has to be you. You know what I mean? Right now a lot of the communication from [the mother] is going through your mom and is going through the paternal [great-]grandmother. So I don't, at this stage, find that it's in [A.D.]'s best interest for me to grant joint legal to you, sir. So I am going to be signing these with legal custody, physical custody, and primary residence to mother."

The father's participation in the activities he wanted to have joint control over had been minimal. He did not regularly attend medical

8

appointments, for example, or seek to involve himself in A.D.'s day care arrangements. He did not know the name of the church where she went to daycare. Instead of seeking to involve himself, he blamed the mother and the social worker for not keeping him informed. Visit scheduling had been left in the hands of the paternal grandmother and paternal great-grandmother.

The court's decision regarding legal custody was not inconsistent, as the father suggests, with its determination that frequent visits were to continue. A parent can be a meaningful presence in a child's life without participating in decisions regarding medical care or education. While there was evidence visits with the child went well, there was also ample evidence that the father would miss visits or show up late. He also missed compliance visits with SSA.

Taken together, there was ample evidence from which the court could reasonably conclude that the father had simply not demonstrated he was willing and able to take such an active role in the child's life that joint decisionmaking was appropriate. Minor's counsel was opposed to the father's attempt to obtain legal custody.

Further, the record reflected the type of parental cooperation necessary for such decisionmaking to work was absent. As late as summer of 2024, the father was leaving threatening messages for the mother, and she was concerned that he owned a firearm. The father admitted at that time that he did not get along with the mother, although he denied threatening her. Both the father's ability to provide input into the relevant decisions and the potential lack of parental cooperation were relevant factors for the court to consider.

Additionally, the father's own testimony at the hearing reflected that his desire for joint legal custody was more of a stepping stone to

increased custody rights than an end in itself. Because the dependency case is now closed, if circumstances change, the father is free to seek modification of the court's orders in family court. But the record reflects that the court considered the totality of the circumstances and reached a decision regarding legal custody that was within its sound discretion. The court's ruling was not arbitrary, capricious, or patently absurd. (*In re J.M., supra,* 89 Cal.App.5th at p. 113.) We find no error.

## DISPOSITION

The juvenile court's order is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.